RARITAN RIVER STEEL CO. v. CHERRY, BEKAERT & HOLLAND, ET AL.

No. 9026SC170

(Filed 18 December 1990)

**Contracts § 120 (NCI4th) — audited financial statements — action against accountants — breach of third party beneficiary contract**

Summary judgment was improperly allowed for defendants in an action against an accounting firm for breach of a third party beneficiary contract arising from an audited financial statement because issues of whether IMC as promisee intended to benefit creditors like plaintiff and whether defendant promisor reasonably had such intent are genuinely subject to dispute. Reliance on the actual audited financial statements is not an element of this third party beneficiary claim; however, reasonable reliance may give rise to a right against the promisor, and reliance on the contract is also relevant to the issue of damages.

Am Jur 2d, Accountants § 19.

Liability of public accountant to third parties. 46 ALR3d 979.

Judge DUNCAN dissenting prior to 30 November 1990.

1

RARITAN RIVER STEEL CO. v. CHERRY, BEKAERT & HOLLAND

[101 N.C. App. 1 (1990)]

APPEAL by plaintiff from order filed 9 November 1989 by *Judge Chase B. Saunders* in MECKLENBURG County Superior Court. Heard in the Court of Appeals 21 September 1990.

*Grier and Grier, P.A., by Joseph W. Grier, III and J. Cameron Furr, Jr., for plaintiff-appellant.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by James G. Billings, Mark A. Ash and Michael D. Hill, for defendant-appellees.*

GREENE, Judge.

Plaintiff appeals the trial court's order filed 9 November 1989 allowing the defendants' motion for summary judgment.

Raritan River Steel Company (plaintiff) is a company engaged in selling raw steel. Cherry, Bekaert & Holland (defendants) is a North Carolina firm of certified public accountants. Before its bankruptcy, Intercontinental Metals Corporation (IMC) purchased the plaintiff's raw steel. In June, 1981, IMC entered into a contract with the defendants under which the defendants agreed to audit IMC's financial statements for the years ending 30 September 1980 and 30 September 1981. Pursuant to the contract, the defendants were to conduct the audit "in accordance with generally accepted auditing standards" and then were to express an "opinion on the fairness of the presentation of these financial statements in conformity with generally accepted accounting principles applied on a consistent basis."

In January, 1982, defendants issued a qualified opinion concerning IMC's financial statements, stating that IMC's net worth as of 30 September 1981 was $6,964,475.00. Plaintiff never examined the actual audited financial statements. However, the plaintiff reviewed a summary of the audited statements which was published in Dun & Bradstreet reports in April and May of 1982. The summary read in part:

[P]repared from statement(s) by Accountant: Cherry, Bekaert & Holland, CPA. ACCOUNTANTS OPINION: 'Accountants indicate that the figures of Sep 30 1981 present fairly the financial position of the company in conformity with accepted accounting principles subject to the following qualifications or exceptions: the ultimate outcome of a dispute with a foreign supplier is not presently determinable.'

The summary also showed IMC's net worth to be $6,964,475.00. The plaintiff argues that because the defendants did not conduct its audit according to generally accepted auditing or accounting principles, the defendants overstated IMC's actual net worth by twenty million dollars, the actual net worth being negative 14.6 million dollars. The plaintiff contends that based upon the Dun & Bradstreet summary it decided to sell steel to IMC on open credit terms. By December, 1982, with plaintiff's IMC account at an outstanding balance of $2,247,844.61, IMC went involuntarily into bankruptcy. From IMC's bankruptcy estate, the plaintiff received only $511,143.60.

On 13 February 1985, the plaintiff filed suit against the defendants in the Superior Court of Mecklenburg County for the losses it sustained on account of the defendants' alleged erroneously audited financial statements. Plaintiff sued on two theories, one based upon defendants' negligent preparation of the statements, the other based upon principles governing third party beneficiary contracts. On 9 May 1985, the trial court granted the defendants' motion to dismiss both claims for failure to state a claim upon which relief could be granted. This Court reversed the trial court. *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 79 N.C. App. 81, 339 S.E.2d 62 (1986). Our Supreme Court affirmed in part and reversed in part this Court's decision, declining to review this Court's decision with regard to the plaintiff's third party beneficiary claim, yet holding that the plaintiff had not stated a claim upon which relief could be granted with regard to defendants' alleged negligence. *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 367 S.E.2d 609 (1988). Thereafter, the plaintiff pursued its breach of contract claim. On 30 December 1988, the defendants moved for summary judgment which the trial court allowed on 8 November 1989, *nunc pro tunc*, 27 October 1989.

---

The issue is whether there is a genuine issue of material fact that the contract and surrounding circumstances evidence an intent that the plaintiff was an intended beneficiary of the defendants' contract with IMC.

Summary judgment is proper where there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. N.C.G.S. § 1A-1, Rule 56(c). "[A]n issue is genuine if it can be maintained by substantial evidence. . . . A fact is

material if it would establish any material element of a claim or defense." *Martin v. Ray Lackey Enter.*, 100 N.C. App. 349, 353, 396 S.E.2d 327, 330 (1990) (citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Commissioner of Ins. v. North Carolina Fire Ins. Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977). "In ruling on a motion for summary judgment the evidence is viewed in the light most favorable to the non-moving party." *Hinson v. Hinson*, 80 N.C. App. 561, 563, 343 S.E.2d 266, 268 (1986). The movant "has the burden of showing at least one of the three grounds justifying summary judgment in his favor: [1] 'an essential element of plaintiff's claim is nonexistent . . . [2] plaintiff cannot produce evidence to support an essential element of his claim, or . . . [3] plaintiff cannot surmount an affirmative defense which would bar the claim.' " *Clark v. Brown*, 99 N.C. App. 255, 260, 393 S.E.2d 134, 136-37 (1990) (citations omitted). *See also Edwards v. Akion*, 52 N.C. App. 688, 690, 279 S.E.2d 894, 896, *aff'd*, 304 N.C. 585, 284 S.E.2d 518 (1981) (movant must clearly establish that no triable issue of fact exists and that movant "is entitled to judgment as a matter of law"). "Once the moving party meets this burden, the burden is then on the opposing party to show that a genuine issue of material fact exists. . . . If the opponent fails to forecast such evidence, then the trial court's entry of summary judgment is proper." *White v. Hunsinger*, 88 N.C. App. 382, 383, 363 S.E.2d 203, 204 (1988) (citation omitted).

The plaintiff's claim is based on the theory that it was the third party intended beneficiary of a contract entered into between IMC (promisee) and the defendants (promisor). *See* Restatement (Second) of Contracts § 2(1)-(3) (1979) (defining "promisee" as the person to whom a manifestation of intention to act in a specified way is addressed, and defining "promisor" as the person manifesting such intention).

In North Carolina " '[t]he rule is well established . . . that a third person may sue to enforce a binding contract or promise made for his [direct] benefit even though he is a stranger both to the contract and to the consideration.' " *American Trust Co. v. Catawba Sales & Processing Co.*, 242 N.C. 370, 379, 88 S.E.2d 233, 239 (1955) (citation omitted). "If a class of persons is clearly designated as beneficiaries, an individual of that class can maintain suit though not specifically named." 4 Corbin, Corbin on Contracts § 781 (1951). *See also* 4 Corbin § 786 (third party need not be

sole party benefited). However, the precise test for determining whether a contract has been made for a person's direct benefit, and therefore whether that person is a third party beneficiary of the contract, is unclear. *Compare Vogel v. Reed Supply Co.*, 277. N.C. 119, 127-28, 177 S.E.2d 273, 278 (1970) *with Snyder v. Freeman*, 300 N.C. 204, 221, 266 S.E.2d 593, 604 (1980).

In *Vogel*, our Supreme Court expressly adopted the Restatement of Contracts § 133(1)(a) (1932) which determines third party donee beneficiary status by focusing on the intent and purpose of the promisee to the contract. *Vogel*, 277 N.C. at 127-28, 177 S.E.2d at 278. At the same time, *Vogel* also stressed the importance of looking at the intent of both the promisor and the promisee. *Id.* at 128, 177 S.E.2d at 279. In *Snyder*, our Supreme Court adopted the tentative draft of the Restatement (Second) of Contracts § 133 (1973), now cited as Restatement (Second) of Contracts § 302 (1979). *Snyder*, 300 N.C. at 220-21, 266 S.E.2d at 604 (1973 version is identical to the 1979 version). Restatement (Second) of Contracts § 302 provides:

§ 302. Intended and Incidental Beneficiaries

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the *intention of the parties* and either

    (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

    (b) the circumstances indicate that the *promisee* intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Id.* (emphases added). Although § 302 of the Restatement (Second) eliminates the earlier "donee" and "creditor" beneficiary categories used in the first Restatement in favor of the comprehensive category of "intended beneficiary," the comments to the Restatement (Second) explain that "[t]he type of beneficiary covered by Subsection (1)(a) is often referred to as a 'creditor beneficiary,'" and the type of beneficiary covered by Subsection (1)(b) is often referred to as a "donee beneficiary." Restatement (Second) of Contracts § 302 comments b-c (1979). *See also Snyder*, 300 N.C. at 221, 266 S.E.2d at 604 (citing comment b).

There is thus a two-part test under the Restatement (Second) for determining whether one is an intended third party beneficiary: (1) the recognition of the beneficiary's right must be "appropriate to effectuate the intention of the parties," and (2) the performance must "satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Here, the plaintiff claims to be a donee or Restatement (Second) of Contracts § 302(1)(b) beneficiary. Consistent with *Vogel, Snyder,* and the Restatement (Second) in determining the existence of a third party donee or § 302(1)(b) beneficiary, the primary focus should be placed upon the promisee's intent because the promisee is the party "who pays for the promise in question." 4 Corbin, *supra,* § 776. This appears to represent the majority view. 2 Hunter, Modern Law of Contracts Par. 23.03[4][a] (1987). According to Professor Corbin,

> the ideas that lie behind such terms as 'purpose,' 'motive,' and 'intention' are obscure and elusive, . . . . When a contract is made, the two or more contracting parties have separate purposes; each is stimulated by various motives, of some of which he may not be acutely conscious. The contract itself has no purpose, motive, or intent. The two parties have purposes, motives, and intentions; but they never have quite the same ones.
>
> In third party cases, the right of such party does not depend upon the purpose, motive, or intent of the promisor. The motivating cause of his making the promise is usually his desire for the consideration given by the promisee.

4 Corbin, *supra,* § 776. However, while the emphasis is on the intent of the promisee, it is also necessary before third party beneficiary status is established that the promisor must have understood that the promisee intended to benefit the third party. We consider that application of this test of emphasizing the intent of the promisee but requiring that the promisor must have reasonably understood the promisee's intent as a prerequisite to third party donee or § 302(1)(b) beneficiary status fully implements the two-part test of the Restatement (Second) of Contracts.

Having determined whose intent is important in determining third party beneficiary status, it is next necessary to determine what evidence is admissible on the issue of intent. In cases involv-

ing third party beneficiaries, our courts do not follow traditional contract rules to determine intent which mandate that resort to extrinsic evidence may be had only when the contract is ambiguous. *See CF Indust., Inc. v. Transcontinental Gas Pipe Line Corp.*, 448 F. Supp. 475, 479-80 (W.D.N.C. 1978). Rather, questions involving the intention of the parties are generally regarded as questions of contract construction, the parties' intent being determined by the contractual provisions, construed in the light of both the circumstances under which the contract was made and the apparent purpose that the parties were trying to accomplish. *Bolton Corp. v. State of North Carolina*, 95 N.C. App. 596, 600, 383 S.E.2d 671, 673-74 (1989) (citation omitted), *disc. rev. denied*, 326 N.C. 47, 389 S.E.2d 85 (1990); *Lane v. The Aetna Cas. & Sur. Co.*, 48 N.C. App. 634, 638-39, 269 S.E.2d 711, 714-15 (1980), *disc. rev. denied*, 302 N.C. 219, 276 S.E.2d 916 (1981). *See also* Restatement of Contracts § 133(1)(a) (looking to "the accompanying circumstances"); Restatement (Second) of Contracts § 302 Reporter's Note ("court in determining the parties' intention should consider the circumstances surrounding the transaction as well as the actual language of the contract"). "When a third person seeks enforcement of a contract made between other parties, the contract must be construed strictly against the party seeking enforcement." *Lane*, 48 N.C. App. at 638, 269 S.E.2d at 714. However, we note that "[i]t is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made." Restatement (Second) of Contracts § 308; *see also* Restatement (Second) of Contracts § 302 comment c (contact or communication with beneficiary not essential).

The defendants produced evidence which negates the plaintiff's assertion of intent. Although the defendants were generally aware that a third party might get a copy of the audited financial statements, they never knew for a fact that IMC was going to distribute the statements to anyone, including Dun & Bradstreet. Wolfgang Jansen, IMC's chief executive officer, testified that "it was never the mutually expressed intention between IMC and Cherry, Bekaert & Holland to create any rights in the plaintiff, Raritan River Steel, or any other unsecured third party trade creditor." IMC never informed the plaintiff that defendants' audit was being performed for plaintiff's benefit. The contract between IMC and the defendants expresses no intent to benefit any third party. It also does not refer to any particular third party. The

contractual ·language in this case which the defendant argues evidences no intention by IMC and defendants to create third party beneficiary rights in the plaintiff reads as follows:

> As you know, management has the primary responsibility for properly recording transactions in the records, for safeguarding assets and for preparing accurate financial statements. *Our basic audit function is to add reliability to those financial statements.* [Emphasis added.]

Furthermore, the plaintiff never received a copy of the contract or copies of the audited financial statements. This fact is consistent with IMC's general policy in 1981 which was "to limit the distribution of IMC's financial statements as much as possible, especially not to distribute them routinely to trade creditors." IMC refused the plaintiff's request to provide a copy of the statements to the plaintiff. In fact, of the 150 to 200 copies of the audited financial statements that the defendants sent to IMC, the plaintiff can only point to one trade creditor claiming to have received a copy of the statements. The defendants' services were directed solely to IMC's benefit, defendants' obligation under the contract being fully performed upon completion of the audit. The defendants argue that the benefit of the added reliability to the financial statements was intended to go to IMC's management, lenders, and shareholders, not to the plaintiff. From the evidence of both the circumstances existing at the time of the contract and the contracting parties' apparent purposes, the defendants contend that no clear intent to benefit the plaintiff can be found within the contractual language or the surrounding circumstances. With this evidence the defendants have met their burden of proving that no genuine issue of fact exists as to whether IMC and the defendants intended that the plaintiff benefit from their contract. However, the plaintiff's forecast of the evidence tends to establish that a genuine issue of material fact does exist in this case.

In asserting that the parties intended the plaintiff to receive the benefit of the contract, the plaintiff produced the following evidence: Chris Rasmussen, the defendants' Audit Manager in charge of the IMC audit, testified that "[i]n my experience, audits are done to supply the needs of some third party individual, either absentee owners or creditors." The defendants' technical manual provides that "financial statements are the means by which the information accumulated and processed in financial accounting is

periodically communicated to those who use it. They are designed to serve the needs of a variety of users, particularly owners and creditors." At all times in issue, the plaintiff was a multimillion dollar creditor of IMC. In an affidavit submitted by John Lewis, a certified public accountant, Mr. Lewis explained the purposes of financial reporting. He stated:

> The Financial Accounting Standards Board ('FASB'), a self-regulatory organization of the public accounting profession and U.S. industry responsible for promulgating accounting standards, has issued its *Statement of Financial Accounting Concepts No. 1, Objectives of Financial Reporting by Business Enterprises, November, 1978 ('SFAC #1')*. . . . SFAC #1 includes the following statements:

> 'Many people base economic decisions on their relationships to and knowledge about business enterprises and thus are potentially interested in the information provided by financial reporting. Among the potential users are owners, lenders, suppliers, potential investors and creditors, employees, management, directors, customers, financial analysts and advisors, brokers, underwriters, stock exchanges, lawyers, economists, taxing authorities, regulatory authorities, legislators, financial press and reporting agencies, labor unions, trade associations, business researchers, teachers and students and the public.

> The function of financial reporting is to provide information that is useful to those who make economic decisions about business enterprises and about investments in or loans to business enterprises. Independent auditors commonly examine or review financial statements and perhaps other information, and both those who provide and those who use that information often view an independent auditor's opinion as enhancing the reliability or credibility of the information.'

In addition, the defendants never restricted dissemination of the audited financial statements, and in fact, IMC ordered and the defendants sent between 150 and 200 copies to IMC. In an affidavit submitted by Wilburn Robinson, vice-president and controller of IMC through its bankruptcy, Mr. Robinson discussed the process by which Dun & Bradstreet obtained the information from the audited financial statements for its published report. He also stated that "IMC had similarly allowed Dun & Bradstreet, in anticipation of publication of summary information, to review

copies of IMC's financial statements, audited by Cherry, Bekaert and Holland, for years prior to IMC's fiscal year ending September 30, 1981 and in fact Dun & Bradstreet had published summary information from pre-1981 Cherry, Bekaert and Holland audited financial statements." The plaintiff contends that the above conduct reveals that the contracting parties intended third parties to receive the information contained within the audited financial statements. The plaintiff argues that the above evidence concerning both the circumstances as they existed at the time of contracting and the contracting parties' apparent purposes for the contract establishes the reasonable meaning of the contractual language: IMC and the defendants intended for creditors, like the plaintiff, to benefit from the defendants' audit in that the added reliability of the audited financial statements would allow the creditors to determine accurately IMC's credit value, thus allowing them to extend credit to IMC confidently based upon IMC's positive net worth as shown in the audited financial statements.

Because the issues of whether IMC as promisee intended to benefit creditors, like the plaintiff, and whether defendant, promisor, reasonably understood that IMC had such intent are genuinely subject to dispute, summary judgment was improperly allowed, and these genuine issues remain to be decided by the jury. *See Burrow v. Westinghouse Electric Corp.*, 88 N.C. App. 347, 351, 363 S.E.2d 215, 218, *disc. rev. denied*, 322 N.C. 111, 367 S.E.2d 910 (1988), *and Smith v. Currie*, 40 N.C. App. 739, 742, 253 S.E.2d 645, 647, *disc. rev. denied*, 297 N.C. 612, 257 S.E.2d 219 (1979) (citation omitted) (issues of intent are "rarely susceptible to direct proof and almost always depends on inferences drawn from circumstantial evidence," therefore summary judgment is generally not appropriate when such an issue is involved, or where the evidence " 'is subject to conflicting interpretations,' " or where reasonable people might disagree on its significance).

Furthermore, contrary to the defendants' argument, reliance on the actual audited financial statements is not an element of this third party beneficiary claim. The elements of a third party beneficiary claim are " '(1) the existence of a contract between two other persons; (2) that the contract was valid and enforceable; and (3) that the contract was entered into for his direct, and not incidental, benefit.' " *Raritan*, 79 N.C. App. at 85-86, 339 S.E.2d at 65; *cf. Raritan*, 322 N.C. at 206-07, 367 S.E.2d at 612-13 (reliance is element of tort of negligent misrepresentation).

RARITAN RIVER STEEL CO. v. CHERRY, BEKAERT & HOLLAND

[101 N.C. App. 1 (1990)]

While a lack of reliance may not defeat a third party beneficiary claim, reasonable reliance, "even though a third person is not an intended beneficiary of a promise, . . . *may* give rise to a right against the promisor." 3 Farnsworth, Farnsworth on Contracts § 10.3 (1990) (emphasis added). *See also* Restatement (Second) of Contracts § 302 comment d (1979). *Cf. Lee v. Paragon Group Contractors, Inc.*, 78 N.C. App. 334, 340, 337 S.E.2d 132, 136 (1985), *disc. rev. denied*, 316 N.C. 195, 345 S.E.2d 383 (1986). Reliance on the contract is also relevant to the issue of damages because "[a]fter a plaintiff has been established as a beneficiary with enforceable rights, the extent of his remedy may be affected by his having acted in reliance thereon." 4 Corbin, *supra*, § 779B.

The trial court's order allowing defendants' motion for summary judgment is reversed and the case is remanded.

Reversed and remanded.

Judge ORR concurs.

Judge DUNCAN dissents.

Judge DUNCAN dissented to this opinion prior to 30 November 1990.

Judge DUNCAN dissenting.

I disagree that there is a genuine issue of material fact here as to whether plaintiff is an intended beneficiary of defendant's contract with IMC. It is undisputed that the contract between defendant and IMC does not express an intent to benefit creditors and does not mention plaintiff. Neither creditors generally nor plaintiff in particular were informed that the audit was being performed. IMC had a stated policy of limiting the distribution of such audits, and specifically refused to supply plaintiff a copy. Nor did defendant send copies of the audit to plaintiff.

In fact, it is undisputed that plaintiff did not even *see* a copy of the audit itself. Two of plaintiff's officers saw only a Dun and Bradstreet synopsis. Further, plaintiff's president, who made the actual decision to continue shipping steel to IMC, saw neither the audit nor the Dun and Bradstreet report. Our Supreme Court has held that a plaintiff must have relied on the audited financial state-

ment itself in order to recover for negligent misrepresentation. *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 367 S.E.2d 609 (1988). It is also undisputed that defendant had no knowledge that IMC intended to release the audit to Dun & Bradstreet.

In view of the undisputed evidence that defendant and IMC attempted to *limit* circulation of the audit on which plaintiff purports to have relied, and plaintiff's own admission that the officer who made the critical decision did not rely on the audit itself or the Dun & Bradstreet report, I would not extend defendant's potential liability on the basis of facts as attenuated as these.